**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION**

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Criminal Action No.: 3:17-cr-00575-JMC |
| v. | ) | |
| | ) | |
| Vance Edward Volious, Jr., | ) | |
| | ) | **ORDER AND OPINION** |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

This matter is before the court on Defendant Vance Edward Volious, Jr.'s Motion to Suppress (ECF No. 222). The Government opposes Defendant's Motion (ECF No. 234 at 30-31). For the reasons set forth below, the court **DENIES** Defendant's Motion to Suppress (ECF No. 222).

## I.     RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

On June 20, 2017, the Government filed a four-count Indictment against Defendant and two other co-defendants. (ECF No. 22.) Count 1 of the Indictment charges Defendants with conspiracy to violate federal law and it contains allegations that Defendants "ordered, paid for, received, armed and attempted to reship a mail bomb for the purpose of killing an intended victim." (*Id.* at 1.) Additionally, the Indictment alleges that Defendants conspired to distribute controlled substances. (*Id.* at 3-4.) Count 2 charges Defendants with the transport and receipt of explosives to kill an individual, in violation of 18 U.S.C. § 844(d) & 2. (*Id.* at 8.) Count 3 charges Defendants with mailing a nonmailable item with intent to kill, in violation of 18 U.S.C. § 1716(j)(2) & 2. (*Id.* at 9.) Count 4 charges Defendants with carrying explosives during the commission of a felony, in violation of 18 U.S.C. § 844(h) & 2. (*Id.*)

On January 20, 2018, Defendant filed a Motion to Suppress "all statements made by him to law enforcement officers whenever officers interviewed Defendant at his house, the detention center, at FBI headquarters, during the polygraph, and any other statement unknown as of this filing."[1] (ECF No. 222 at 1.) Defendant bases his Motion on the grounds that Defendant's Fifth and Sixth Amendment rights were violated, in addition to a violation of the electronic recording policy implemented by the Government in 2015.[2] (*Id.*)

On February 3, 2018, the Government filed a response in opposition asserting that all statements given by Defendant were made while he was not in custody. "Defendant gave statements voluntarily in his home, voluntarily agreed to be transferred to FBI headquarters, voluntarily agreed to take a polygraph examination, and voluntarily agreed to a pre-polygraph interview. At no time was Defendant under arrest, formally or functionally. Thus, *Miranda* does not apply." (ECF No. 234 at 30.)

On March 7, 2018, the court held a suppression hearing in which both parties were present. (ECF No. 267.) Both parties were given an opportunity to question the Government's witness, FBI Special Agent Tartaglia who was one of Defendant's interviewing agents and involved in the execution of the search warrant at Defendant's house on June 7, 2017, and Defendant himself. Six exhibits were admitted into evidence: (1) the application and search warrant for Defendant's house;

---

[1] At the suppression hearing, Defendant did not present to the court any statements at additional settings that he wished to suppress. The suppression hearing focused on the statements Defendant made while at his house, on the way to the FBI headquarters, and at the FBI headquarters.

[2] The court will not address this argument. The Department of Justice's Recording Policy expressly states:

> This policy is solely for internal Department of Justice guidance. It is not intended to, does not, and may not be relied upon to create any rights or benefits, substantive or procedural, enforceable at law or in equity in any matter, civil or criminal, by any party against the United States . . . nor does it place any limitation on otherwise lawful investigative and litigative prerogatives of the Department of Justice."

(ECF No. 222-1 at 1-2.)

(2) the FBI Advice of Rights waiver; (3) the FBI Consent to Interview with Polygraph waiver; (4) Columbia Police Department ("CPD") dash and body cam; (5) four screenshots from the CPD dash cam; and (5) a FBI sketch of Defendant's house downstairs.  (ECF No. 268.)

## II.     LEGAL STANDARD

The Fifth Amendment provides that [n]o person . . . shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  In *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), the Supreme Court held that a person who is subject to "custodial interrogation" must "be warned that he has a right to remain silent, that any statement that he does make may be used as evidence against him, and that he has a right to the presence of an attorney."  "Failure to administer *Miranda* warnings creates a presumption of compulsion.  Consequently, unwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded under *Miranda*."  *Oregon v. Elstad*, 470 U.S. 298, 306 (1985).

Where a defendant challenges the admissibility of a statement under *Miranda*, "the government bears the burden of establishing by a preponderance of the evidence that the statement was not the product of custodial interrogation conducted in the absence of *Miranda* warnings." *United States v. Bello-Murillo*, No. 1:13–cr–00310–GBL–3, 2014 WL 6682630, at *2 (E.D. Va. Nov. 14, 2014) (citing *Colorado v. Connelly*, 479 U.S. 157, 168 (1986)).  A waiver of *Miranda* rights must be "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran v. Burbine*, 475 U.S. 412, 421 (1986).  "Coercive police activity is a necessary predicate to a finding that a waiver of *Miranda* rights is not 'voluntary.'"  *United States v. Cristobal*, 293 F.3d 134, 141 (4th Cir. 2002).

In determining whether a defendant is in custody for the purposes of *Miranda* protection, "the ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement

of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (internal quotation marks and citation omitted).  In deciding what qualifies as the functional equivalent of "custody" outside of a formal arrest, courts generally consider whether "a reasonable man in the suspect's position would have understood his situation" to be custodial.  *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984).  More specifically, a court considers whether "under the totality of the circumstances, 'a suspect's freedom of action is curtailed to a degree associated with formal arrest.'"  *United States v. Parker*, 262 F.3d 415, 419 (4th Cir. 2001) (quoting *Berkemer*, 468 U.S. at 440).

## III.    ANALYSIS

The court considers whether a reasonable person in Defendant's position prior to making his statements would have understood his situation as custodial.  The Court of Appeals for the Fourth Circuit has articulated that this analysis specifically requires a consideration of whether "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *United States v. Jamison*, 509 F.3d 623, 628 (4th Cir. 2007).  Courts applying this standard have looked to surrounding circumstances of the interrogation, including, for example, "the time, place and purpose of the encounter, the words used by the officer, the officer's tone of voice and general demeanor, the presence of multiple officers, the potential display of a weapon by an officer, and whether there was any physical contact between the officer and the defendant." *United States v. Day*, 591 F.3d 679, 696 (4th Cir. 2010) (internal quotation marks omitted).

The court separates its analysis of Defendant's contact with law enforcement officials into two settings: Defendant's house and the FBI headquarters (including the drive to the FBI headquarters).

**A. Defendant's House**

1. Time

The time factor in *Day* references the actual time of day in which the questioning took place. Defendant's interactions with law enforcement officials were during normal daytime hours (approximately 9 a.m. until 4 p.m.), not late at night or during the night. While such a fact leans in favor of the Government, the court recognizes that the duration of time Defendant was with law enforcement officials during the day in question is also significant. *See United States v. Beard*, No. 04-4044, 2005 WL 32831, at *3 (4th Cir. Jan. 7, 2005).

In *Beard*, the Fourth Circuit held that Defendant was not "in custody," for *Miranda* purposes, at the time he made incriminating statements to the police. *Id*. The court relied on the following factors: the *interaction happened very quickly*, the defendant was not handcuffed or otherwise restrained, there was no evidence that officers drew their weapons in the defendant's presence or were antagonistic towards him, the defendant was in his own bedroom in his house and was never told he was not free to leave, and although one of the officers signaled to the second officer that they were going to end up "cuffing" the defendant, there was no evidence that the defendant either observed or understood the signal) (emphasis added). *Id*. Although Agent Tartaglia testified at the suppression hearing that the interview inside Defendant's house between himself, Agent Socha[3] and Defendant lasted approximately 45 minutes, according to Agent Tartaglia's interview log notes, the interview actually lasted approximately three hours. (ECF No. 290 at 68-69.) The court notes that Agent Tartaglia testified that the questioning did not last the entire three hours, as Defendant was allowed cigarette breaks as requested. (*Id*. at 87.)

---

[3] FBI Special Agent Socha was involved in interviewing Defendant with Agent Tartaglia on June 7, 2017.

The Supreme Court in *Berghuis v. Thompkins*, 560 U.S. 370, 372 (2010), dealt with an interview lasting around the same time frame as in the present case, analyzing whether a three-hour interview significantly impacted the presence of officer coercion:

> There is no evidence that Thompkins's statement was coerced. Thompkins does not claim that police threatened or injured him during the interrogation or that he was in any way fearful. The interrogation was conducted in a standard-sized room in the middle of the afternoon. It is true that apparently he was in a straight-backed chair for three hours, but there is no authority for the proposition that an interrogation of this length is inherently coercive. Indeed, even where interrogations of greater duration were held to be improper, they were accompanied, as this one was not, by other facts indicating coercion, such as an incapacitated and sedated suspect, sleep and food deprivation, and threats. The fact that Helgert's question referred to Thompkins's religious beliefs also did not render Thompkins's statement involuntary. The Fifth Amendment privilege is not concerned with moral and psychological pressures to confess emanating from sources other than official coercion.

Accordingly, the court does not find that the fact the interview lasted three hours indicates inherent police coercion.

2. Place

Defendant's interview took place in his house. Agent Tartaglia and Agent Socha sat at either end of the six-chair table in Defendant's dining room. (ECF No. 290 at 117.) The parties agree that the dining room had an open floor plan, whereby the living room, kitchen and dining room area were not partitioned off, but instead flowed together. (*Id*. at 86, 116.) The court is in agreement with this depiction, as it observed the floor plan of Defendant's house that was entered into evidence. (*See* ECF No. 268.)

The Fourth Circuit has expressed that for purposes of *Miranda*, it is not custody *per se* that is integral to the analysis, but it is "the *custodial* nature of the interrogation which triggers the necessity for adherence to the specific requirements of the *Miranda* holding." *United States v. Jones*, 818 F.2d 1119, 1123 (4th Cir. 1987). Notably, the Supreme Court has found a defendant

to be in custody in their own home. *See Orozco v. Texas*, 394 U.S. 324 (1969). In *Orozco*, four police officer's arrived at the defendant's house, admitted by an unidentified woman, entered his bedroom and began to question him. *Id*. at 325. One of the officers testified that from the moment defendant gave his name, he was not free to go where he pleased but was in fact under arrest. *Id*.

Distinguishing from *Orozco*, in *Parker*, the Fourth Circuit held that a suspect was not entitled to *Miranda* warnings while being questioned by law enforcement officers in her bedroom of her home. 262 F.3d at 418. The Fourth Circuit discussed the factors that they took into consideration in their ruling:

> The door to the room was closed or nearly closed during the interview, which lasted approximately 30 minutes. One agent sat on a chair, and at least one agent stood against a wall of the 9' x 11' room, while Parker sat on the bed. During the interview, Parker's aunt entered the room twice to speak briefly to her, and Parker did not leave the room or request to do the same. An agent, testifying at the suppression hearing, said that had Parker attempted to do so, she would not have been allowed to leave the house, but would have been allowed to leave the bedroom. Parker was not handcuffed, and at some point during the interview she apparently was informed that she was not under arrest.

*Id*.

Given that Defendant's interview took place in an open space in the dining room area of his home, coupled with the fact that Defendant was informed he was not under arrest and the agents never indicated he was not free to leave, the location of the interview does not support Defendant's Motion to Suppress.

3. Purpose of Encounter

Defendant agreed to the interview that took place in his house. Agent Tartaglia testified that after Defendant had been sitting on his front curb for approximately twenty minutes while the search of his house began, he asked Defendant if he was willing to have a conversation and answer some questions, to which Defendant replied, "yes." (ECF No. 290 at 40.) Agent Tartaglia testified

that Defendant was released from the handcuffs they placed him in for officer safety and they both walked back towards his house.[4]  (*Id*.)  Agent Tartaglia testified that he asked Defendant where they could talk, and he pointed to his dining room table.  (*Id*. at 41.)  The court does not find any facts regarding this factor that weighs in favor of Defendant, especially given that Defendant agreed to speak with the agents.

### 4. Officer's Words, Tone of Voice, General Demeanor

Shortly after law enforcement officials arrived at Defendant's house, Defendant asked Agent Tartaglia if he was under arrest, to which Agent Tartaglia responded that he wasn't, but that he was being investigatively detained because of his non-compliance to their directive to exit the home when they first arrived.  (ECF No. 290 at 38.)  The court recognizes that "informing a suspect that he is not under arrest is one factor frequently considered to show lack of custody."  *Jones*, 818 F.2d at 1125.

During the suppression hearing, Agent Tartaglia stated that six pages of his interview notes with Defendant all dealt with questions about this case.  (ECF No. 290 at 83.)  Defendant, during direct examination, testified to the following in regard to the agents' words, tone of voice, and general demeanor:

> Q. Did they ever tell you that you did not have to answer their questions?
> A: No.
> Q: Did you feel like you didn't have to answer their questions?
> A. I felt like I did.
> Q. Why didn't you just tell them that you wanted to leave?
> A. I didn't feel like they would have let me . . . It didn't seem like I was going to be able to go anywhere.
> Q. Did you feel like you were under arrest at that time?
> A. I felt that way. . . It was kind of like an episode you see on TV, the good cop, the bad cop.  It was Mr. Tartaglia, he was talking calm to me, and then the other agent was slamming his hands on the table and telling me that I

---

[4] The court notes that Defendant testified that the handcuffs were not taken off of him until he sat at his dining room table.  (ECF No. 290 at 97.)

knew, you know, why they were here . . . He was up in my face then in front of me . . . They started slamming these pictures down of I guess it was a bomb, and he told me that that's what these labels were that I printed; that's what they were for.
Q. Did he call you Vance? Did he call you by your name?
A. Everything he was saying was derogatory . . . he was saying that I was Michael Young's little bitch, things like that, things of that nature.
Q. How did you feel towards Agent Socha?
A. I was kind of intimidated.
Q. How about Agent Tartaglia? Were you intimidated by him?
A. No.
Q. When you were smoking cigarettes, who was with you?
A. Tartaglia.
Q. When you were in the vehicle who was with you?
A. Tartaglia.
Q. Was Agent Socha as well?
A. He was in the front, I believe.[5]

(ECF No. 290 at 99-101.)

The court notes that the fact Agent Socha and Agent Tartaglia showed Defendant pictures of the instructions for arming the bomb and the labels during their interview, explicitly portraying Defendant as a suspect, does not presume custody. *Davis v. Allsbrooks*, 778 F.2d 168, 172 (4th Cir. 1985) (holding that interview at police station where officers showed suspect pictures of crime scene was not custodial). The court also notes that Agent Tartaglia labeled Agent Socha's demeanor toward Defendant as "firm." (ECF No. 290 at 80.)

The court recognizes Defendant's testimony regarding his subjective feelings while at his home, but the court does not believe that the agents' words, tone of voice, or general demeanor, although Agent Socha had an evidently more aggressive tone and approach, rose to the level of illegal, inappropriate, or unduly coercive police tactics. *See Miranda*, 384 U.S. at 436 (forbidding coercion, not mere strategic deception by taking advantage of suspect's misplaced trust). Ploys to

---

[5] The court acknowledges that the Government testified that Agent Socha was sitting in the back with Defendant.

mislead a suspect or to lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda's* concerns. *See Oregon v. Matheson*, 429 U.S. 492, 495-96 (1977). Police trickery must be evaluated under the totality of circumstances test, which requires a court to consider (1) the characteristics of the accused, (2) the conditions and setting of the interrogation, and (3) the details of the interrogation. *See United States v. Pelton*, 835 F.2d 1067, 1071 (4th Cir. 1987); *see also United States v. Mashburn,* 406 F.3d 303 (4th Cir.2005) (explaining that an example of an illegal police tactic is the "question-first" interrogation tactic, whereby police officers intentionally withhold *Miranda* warnings, questioning the suspect until securing a confession, then obtaining a waiver of *Miranda* rights from the suspect and covering the same material using leading questions).

According to Agent Tartaglia's testimony, at no time did Defendant appear to not understand the questions he was asking of Defendant nor did Agent Tartaglia have any concerns that Defendant had used alcoholic beverages or was too sleepy to converse with him in a knowing and voluntary way. (ECF No. 290 at 87-88.) Importantly, this was not Defendant's first encounter with law enforcement. (*Id.* at 121.) Defendant stated that during the time when he was given cigarette breaks, he did not feel intimated because he was escorted by Agent Tartaglia. (*Id.* at 101.) Based on the totality of the circumstances, the court does not feel that Defendant was unduly coerced or that the agents were intending to trick Defendant into confessing, but instead were merely engaging in standard police strategy or tactics.

5.  <u>The Presence of Multiple Officers</u>

The court acknowledges that there were at least twenty law enforcement officials and a handful of vehicles present at Defendant's house at multiple points during the execution of the search warrant. (ECF No. 290 at 57, 86.) Defendant was escorted by at least one, if not two, law

enforcement officials at all times while they were at his house.  (*Id*.)  While there were multiple law enforcement officers walking about Defendant's house during the interview, only Agent Tartaglia and Agent Socha were at the table questioning Defendant.  At multiple times during the suppression hearing, Agent Tartaglia explained that although Defendant was followed every time he took his requested cigarette breaks, he was also still in and around the premises where the execution of the federal search warrant was simultaneously taking place.  (ECF No. 290 at 66.)  The court finds this to be a reasonable explanation.  The court also understands that the number of police officers present was not excessive under the circumstances.  However, the court adds that "a person subjected to custodial interrogation is entitled to the benefit of the procedural safeguards enunciated in *Miranda*, regardless of the nature or severity of the offense of which he is suspected or for which he was arrested."  *Berkemer*, 468 U.S. at 434.

During the hearing, Agent Tartaglia remarked that "[Defendant] could have said I'm going in my car and I'm leaving to go down the street and we could have let him . . . We would have moved the cars [blocking his driveway] and let him drive away . . . He was free to leave."  (ECF No. 290 at 67.)  The court acknowledges that it does not give weight to Agent Tartaglia's hindsight testimony.  *See Stansbury v. California*, 511 U.S. 318, 319 (1994) (standing for the proposition that an officer's subjective and undisclosed view surrounding an interrogation is irrelevant to the assessment of whether the person is in custody; instead this is an objective perspective of interrogation from a reasonable person); *see also Beard*, 2005 WL 32831, at *4 (holding relevant inquiry when determining whether defendant was "in custody" for *Miranda* purposes required focus on circumstances as defendant perceived them and examination of conclusions a reasonable person would draw, rather than on what officers would do if defendant attempted to leave).  Further, the court does not believe a reasonable person in Defendant's position, taking into account

the presence of law enforcement officials and their surrounding vehicles, would have, as Agent Tartaglia suggests, felt free to leave.

      6.   <u>Potential Display of Weapon by Officer</u>

Next, as the court viewed in the dash cam video, guns were pointed towards Defendant and his front door when the law enforcement officials first arrived at his house. (*See* ECF No. 268.) However, the court noticed that as soon as Defendant was brought down to his front lawn (in handcuffs) and sat on the curb, the law enforcement officials ceased pointing their guns in Defendant's direction. (*Id*.) The court is conscious of the fact that the officers that are walking about Defendant's house during the execution of the search warrant are fully armed and in their respective gear. (ECF No. 290 at 57.) However, during the interview in Defendant's dining room, Agent Tartaglia and Agent Socha's firearms were on their hips or upper thigh, and thus were not visible to Defendant while they were sitting at the table. (*Id*. at 42.) The court has no evidence that either agent brandished his weapon during the interview. Consequently, as to this factor, there are not overly significant facts that lean in favor of Defendant's Motion to Suppress.

      7.   <u>Physical Contact Between Officer and Defendant</u>

The only physical contact the court is aware of between a law enforcement official and Defendant was when Defendant was handcuffed after the officials first arrived at his house. During the hearing, Agent Tartaglia explained that Defendant was handcuffed because he did not follow the law enforcement's directive to come outside when they ordered him, thereby putting into question officer safety. (ECF No. 290 at 39.) Defendant corroborates that reasoning by testifying that after SWAT and FBI arrived at his house and announced their presence, he took a step back from the front door and went into his bedroom to get dressed before submitting to the authorities. (*Id*. at 94.)

The court believes Defendant's action at that instant discredits his level of fear given that he felt comfortable enough in the setting to get dressed despite the commands from the FBI and the apparent distress of his wife. Defendant being put in plastic zip ties (and later metal handcuffs because of Defendant's complaint that the plastic zip ties were tight and uncomfortable) does not automatically assume that he is in custody. *See Day*, 591 F.3d at 697 (finding defendant was not in custody for purposes of Miranda because officers used their firearms and handcuffs for their own safety). Therefore, there was not excessive or concerning physical contact between law enforcement officials and Defendant that would aid the court in a finding of custody.

**B. The Court's Review**

Applying the reasonable person standard to the instant case's facts, the court finds that Defendant was not in custody while at his house. Defendant has not presented to the court any facts from the day in question that he did not agree to speak with the agents or wanted to terminate the encounter. Agent Tartaglia and Agent Socha did not make their weapons explicitly visible as to coerce or threaten Defendant and he was never questioned by more than two people at a time. He was always accompanied during his cigarette breaks, but as discussed above, law enforcement officials had the authority to maintain control of the premises pursuant to the federal search warrant. The court acknowledges the amount of armed law enforcement officials (and their vehicles) surrounding Defendant and his house, but the court understands that is expected given the severity of the charges against Defendant. Accordingly, the totality of the circumstances weigh in favor of a finding of a non-custodial environment at Defendant's house.

### C. FBI Headquarters

1. <u>Time</u>

The court is not privy to the amount of time it took to drive from Defendant's house to the FBI headquarters, but understands it to have been a somewhat brief car ride. Once Defendant arrived at the FBI headquarters, he waited approximately thirty minutes for the polygrapher to arrive (at which time the pre-polygraph interview took place) and according to the transcript, the polygraph test took approximately an hour. (ECF No. 290 at 73.) As discussed at the suppression hearing, as soon as the polygrapher arrived and set up his equipment, Defendant was brought into the polygraph room with the agent in charge of polygraphing him, Agent Icard. (*Id*. at 50.) At that time, Defendant was given an oral and written *Miranda* waiver and a Consent to Interview with Polygraph waiver, both of which Defendant signed. (*Id*. at 52.) The court refers to the hearing transcript for discussion of the total length of time Defendant had been with law enforcement officials during the day in question:

> Q. So at this point, [Defendant] has been in your custody or someone's custody or control since 9:15 a.m., correct?
> A. He's been with us since 9:15.
> Q. Right. He's been with you since 9:15 a.m. So, 10:15, 11:15, 12:15, 1:15, 2:15, almost 3:00, so six, going on six hours, and Special Agent Icard is the first one who tells him of what his rights are, correct?
> A. Yes.
> Q. And how long does the polygraph take?
> A. I don't know, ma'am. I'm not a polygrapher.
> Q. Okay. What time was he transported to the detention center?
> A. I don't recall.
> Q. Would you agree it was at least seven hours that he was in your custody?
> A. I don't recall, ma'am, but that seems like a fair . . .
> Q. At least seven hours would be a very low guess, right?
> A. Yeah.

(*Id*. at 75-76, 85.)

The court finds that an approximately seven-hour interaction with law enforcement officials throughout the day in question weighs in favor of Defendant's Motion to Suppress.

2. Place

The Supreme Court has stated that "[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody." It was that sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited." *Oregon v Mathiason*, 429 U.S. 492, 492 (1977)

The court relies on defense counsel's cross examination of Agent Tartaglia to describe the FBI headquarters:

> Q. You drive up, and there's a parking area to the left?
> A. Yes.
> Q. And there's a booth, there's a very earnest security guard, right?
> A. Yes.
> Q. And he does not let anybody in without seeing your I.D. and calling to make sure you have a reason to be there, correct?
> A. Yes, ma'am.
> Q. And in fact, when you get through the booth, you have another set of doors. You have to walk down a pathway . . . enclosed in a gate.
> A. Uh-huh.
> Q. And you go through another set of door.
> A. Yes.
> Q. When you go through those doors, you have to go through a metal detector.
> A. Guests do, but [Defendant] did not have to.
> Q. He didn't have to go through a metal detector?
> A. No.
> Q. Had he been patted down?

A. Yes.
Q. So even though he wasn't in custody, he was patted down?
A. Yes.
Q. Was that for his safety?
A. That's for our safety and his safety.

(ECF No. 290 at 71-72.)

On direct examination, Defendant described the room he was interviewed in at the FBI headquarters:

Q. Where were you sitting at in the table in the room at the FBI headquarters?
A. I was sitting in the chair just right there I guess at the end of the table.
Q. Where was the door?
A. To my left.
Q. What was behind you?
A. Just wall.
Q. About how big was the room? Let's look at this jury box. Was it bigger than this jury box?
A. Just a little smaller than that.

(ECF No. 290 at 105.)

The court recognizes that the FBI headquarters is inherently more restrictive and intimidating than Defendant's home. Defendant was not free to move about the FBI headquarters, but no one is given that privilege unless they are an authorized employee. The court takes into account that the level of security in place at the FBI headquarters is expected and desired given their line of work, weighing against Defendant's Motion to Suppress.

3. Purpose of Encounter

Similar to the request to interview Defendant at his house, Agent Socha asked Defendant if he'd be willing to take a polygraph examination and he affirmed.[6] (ECF No. 290 at 46.)

_____

[6] Thereafter, Agent Tartaglia testified that law enforcement officials asked to search Defendant's car and he said no. (ECF No. 290 at 48.) However, Defendant testified that he was never asked if law enforcement could search his car. (*Id.* at 108.)

Defendant was given sneakers to change into and was allowed to hug his wife and have a small conversation with her before leaving. (*Id*. at 47.) Defendant left his house in Agent Socha's car to head to the FBI headquarters for the polygraph examination.[7] (*Id*.)

The Supreme Court has given consideration to a defendant's willingness to come to the police station in its analysis of whether *Miranda* protections are required. *See Mathiason*, 429 U.S. at 495 (holding that defendant, who came voluntarily to police station, was immediately informed he was not under arrest, and gave a half hour interview during which he confessed to burglary after which he left the police station without hindrance, was not in custody or otherwise deprived of his freedom of action in any significant way, and it was not necessary that he be given the *Miranda* warnings prior to confession); *see also California v. Beheler*, 463 U.S. 1121, 1125 (1983) (holding that *Miranda* warnings were not required where defendant, although a suspect, was not placed under arrest and voluntarily came to police station and was allowed to leave unhindered after brief interview).

The court does notice that absent in the present case is Defendant's ability to leave unhindered after what is described in the aforementioned cases as a *brief* interview (emphasis added). There is no indication that law enforcement officials told Defendant that he would be returned back home after the polygraph. Importantly, the court heard on the body cam admitted into evidence that the officers repeatedly told Defendant's wife that he was in a lot of trouble and the suspect of a serious crime. (*See* ECF No. 268.) The CPD officer[8] even told Defendant's wife that she would be briefed on the situation "after Defendant was in custody." (*Id*.) The court

---

[7] Agent Tartaglia testified that Agent Socha and Defendant were in the backseat and Defendant was not handcuffed. (ECF No. 290 at 48.) Defendant testified that he was in the backseat alone and handcuffed. (*Id*. at 101-02.)

[8] The court is unsure of the level of briefing the CPD officers present at Defendant's house on the day in question received.

believes that the purpose of the encounter at the FBI headquarters is significantly more adversarial,

given that Defendant is there to take a polygraph test, than the interview that took place at his

home.

4. Officer's Words, Tone of Voice, General Demeanor

The court references Defendant's testimony during direct examination as to the agents'

words, tone of voice and general demeanor:

> Q. What do you recall about driving [to the FBI headquarters]?
> A. I was just in the back seat and we were just driving there. It's kind of quiet.
> Q. Once you got there, what happened?
> A. I got there and they took me in and started questioning me some more.
> Q. Were they asking you the same questions or different questions [that they had asked you at the house]?
> A. Same questions.
> Q. Did they ever offer you food?
> A. They never offered me any food. But also when I was with the cigarettes, I felt like I couldn't go anywhere because everywhere I moved, they shadowed me right there and kind of cornered me off.
> Q. Did you feel like you could stop answering their questions?
> A. No.
> Q. Why?
> A. They were just being aggressive. They were being real aggressive with me; forceful almost like I had to.
> Q. Okay. After the polygraph, what happened next?
> A. After that, [the agent] got up, walked out of the room, and then they came back in and told me I was under arrest.

(ECF No. 290 at 104, 107-08.)

In *Davis*, the Fourth Circuit discusses, *inter alia*, the inquiry into an interview's length of

time, a defendant agreeing to ride with the officers to the police station, and police presence during

interview breaks as it pertains to an individual's *Miranda* rights:

> He argued, among other things, that his confession was obtained in violation of his *Miranda* rights. We disagree and conclude that, since Davis was not in custody when he confessed, *Miranda* was inapplicable. We recognize that Davis' initial contact with the police was the result of his voluntary response to their request to speak to him and that conditions at the police station were as informal as one could expect. Though the initial interview had lasted approximately two hours, "it was

18

not a marathon session designed to force a confession." We find it insignificant that appellant was given a ride to the police station by the detectives, since Davis accepted the ride by voluntarily getting into the car and the crime was not discussed en route. We also reject the contention that the escort Davis was given each time he used the restroom required a conclusion that he was in custody. We hold to be lacking in merit Davis' argument that the detectives' failure to tell him he was free to go supports the conclusion that he was in custody.

778 F.2d at 171.

The court finds *Davis* instructive because Defendant notably agrees to ride with the agents to the FBI headquarters. As Defendant stated, there was not much conversation that occurred on the ride to the FBI headquarters, and the precedent reveals that both being escorted during interview breaks and the agents' failure to tell Defendant he was free to go is not outcome determinative by any means in a *Miranda* analysis.

5.  Presence of Multiple Officers

The court references Defendant's testimony during direct examination in regard to the presence of officers while being interviewed at the FBI headquarters by Agent Tartaglia and Agent Socha:

> Q. Were y'all all sitting down at the table?
> A. Yes.
> Q. Okay. At any point did one or both of them leave?
> A. One would leave. The other one would stay. They would both walk out, I guess talk, and come back in. It was just vice versa.

(ECF No. 290 at 105.)

Unlike at Defendant's house, while at the FBI headquarters Defendant was never surrounded by more than two officers at a time, namely Agent Tartaglia and Agent Socha. The court finds this fact to cut against Defendant's Motion to Suppress.

19

6.   Potential Display of Weapon by Officer

The court is not aware of any information in regard to this factor that is different than the court's discussion of Defendant's house.  Therefore, the court relies on its earlier understanding that Agent Socha and Agent Tartaglia continued to have their weapons on their hips or their upper thighs, but never brandished their weapons.

7.   Physical Contact Between Officer and Defendant

The only time the court is aware of physical contact between a law enforcement official and Defendant is when he was patted down before entering the FBI headquarters, which in no way rises to a level of physical contact that would be concerning to the court.

**D.  The Court's Review**

The purposes of the safeguards prescribed by *Miranda* are to ensure that the police do not coerce or trick captive suspects into confessing, to relieve the "inherently compelling pressures generated by the custodial setting itself, which work to undermine the individual's will to resist," and as much as possible to free courts from the task of scrutinizing individual cases to try to determine, after the fact, whether particular confessions were voluntary. *Berkemer*, 468 U.S. at 433.

The court is sensitive to the fact that Defendant was with law enforcement officials for at least seven hours during the day in question.  However, Defendant has given no indication to the court that at any time he asked if he could leave the FBI headquarters nor told law enforcement officials he didn't want to speak to them.  In fact, Defendant did the opposite.  He agreed to accompany Agent Tartaglia and Agent Socha to the FBI headquarters and to get a polygraph test. Although the court is aware that at the suppression hearing Defendant testified that he did not feel as if he was free to leave, the court is not given evidence to show that law enforcement officials

implemented any coercive tactics that unduly pressured Defendant to speak with them or accompany them, weighing heavily towards the factor of 'purpose of encounter.'

The court wants to make clear that it is not naïve to the reality that in this day and age there are few situations in which individuals may feel free to terminate a law enforcement encounter. However, the court is emboldened to remember the purpose behind *Miranda*. The court carefully and diligently viewed the dash cam and body cam video from the day in question, as well as reviewed the suppression hearing transcript multiple times. The court does not find that Defendant's agreement to go to the FBI headquarters and take a polygraph test was the result of illegal or unduly coercive police tactics that "undermine[d] Defendant's will to resist." *Berkemer*, 468 U.S. at 433.

Based on the totality of the circumstances, the court finds that the Government has met its burden of establishing by a preponderance of the evidence that Defendant's statements were not the product of custodial interrogation.

## IV.    CONCLUSION

Based on the foregoing, the court **DENIES** Defendant's Motion to Suppress (ECF No. 222).


**IT IS SO ORDERED.**

                                        *J. Michelle Childs*

                                        United States District Judge

April 2, 2018
Columbia, South Carolina